UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10959-RGS

INTERSTATE GOURMET COFFEE ROASTERS, INC.

v.

THE TRAVELERS INDEMNITY COMPANY

MEMORANDUM AND ORDER
ON CROSS MOTIONS FOR SUMMARY JUDGMENT

August 6, 2018

STEARNS, D.J.

Interstate Gourmet Coffee Roasters, Inc. (Interstate), a Massachusetts coffee production company, filed an insurance claim with The Travelers Indemnity Company, also known as The Phoenix Insurance Company (Phoenix), after a construction accident knocked Interstate off the electrical grid for thirteen days, effectively bringing its business to a halt. After Phoenix paid out on the claim, Interstate objected to its refusal to pay Interstate's employees the wages and benefits they lost during the stoppage, and to reimburse salaried employees for the vacation days they were forced to take while waiting for the business to reopen. Phoenix offered Interstate an additional $8,000 as a peace offering. The token was refused, and Interstate sued in the Massachusetts Superior Court, claiming breach of

contract, breach of the implied covenant of good faith and fair dealing, and a violation of the Massachusetts Fair Business Practices Act, Mass. Gen. Laws, ch. 93A. Phoenix removed the case to federal district court. Before the court are the parties' cross-motions for summary judgment. The court heard oral argument on July 25, 2018.

## BACKGROUND

On November 6, 2014, Phoenix issued Interstate Commercial Insurance Policy 630-8E877328 (the Policy), effective November 1, 2014 through November 1, 2015.[1] Under the Deluxe Business Income (and Extra Expense) Coverage Form, the Policy provided, in relevant part:

> We will pay for: . . . the actual Extra Expense you incur during the "period of restoration" caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income and Extra Expense Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or resulting from a Covered Cause of Loss. . . .
>
> 2. Extra Expense
>
> Extra Expense means reasonable and necessary expenses described in a., b., and c. below that you incur during the "period of restoration" and that you *would not have incurred if there had been no direct physical loss of or damage to property* caused by or resulting from a Covered Cause of Loss.

---

[1] Def.'s Concise Statement of Material Facts (Def.'s SOF), Dkt. #21, ¶¶ 1-2; Def.'s Mem. in Support of its Motion for Summary Judgment (Def.'s Mem.), Dkt. #20, Ex. 2 at 13.

> a. Expenses to avoid or minimize the suspension of business and to continue "operations" at: (1) the described premises . . . .
> b. Expenses to minimize the "suspension" of business if you cannot continue "operations;" or
> c. Expenses to repair or replace the property, but only to the extent the amount of loss that otherwise would have been payable under this Coverage Form is reduced.[2]

On July 9, 2015, a contractor excavated a trench next to Interstate's place of business. The open ground adjacent to the trench became compromised when it rained that night. Compl. ¶¶ 8-9. Water infiltrated Interstate's electrical system, knocking out all power. The "suspension period" (in the terminology of the Policy) lasted thirteen days. *Id.* ¶¶ 10-11; Def.'s SOF ¶ 1; Def.'s Mem., Ex. A at 51. During the interruption, several Interstate employees – salaried and hourly – "redirected their efforts" to restore regular business operations. Def.'s Mem at 2. The hourly employees were paid at their customary rate, including overtime pay. Pl.'s Opp'n to Def.'s Motion for Summary Judgment (Pl.'s Opp'n), Dkt. #28, at 4. Salaried employees who gave up weekends to take part in the effort were given "time back" in the form of additional vacation time. *Id.* at 9. Some thirty Interstate employees remained idled and either used their accrued leave time or went unpaid. *Id.* at 8.

---

[2] Def.'s Mem. at 7 (emphasis in original).

On July 13, 2015, Interstate submitted a notice of loss to Phoenix. Def.'s SOF ¶ 3. Two days later, on July 15, 2015, George Dennerlein, a Phoenix claim representative, met with Michael Dovner, Interstate's President and CEO, to inspect the damage. *Id.* Dovner informed Dennerlein that he would be withdrawing Interstate's claim, because he "was planning to submit a claim through the contractor's liability carrier." *Id.* After the contractor's carrier rejected the claim, Interstate resubmitted it to Phoenix in January of 2016. The claim specified losses for building damage, damage to personal property, and a $101,289.03 line item seeking reimbursement for all employee compensation accrued during the suspension period, whether paid out or not. *Id.* ¶ 4.

On March 29, 2016, Phoenix paid Interstate $80,853.75 in full satisfaction of the claim, including "$1,714 for extra expenses related to employee compensation." *Id.* ¶ 7. These "extra expenses" included the wages of hourly employees who worked overtime in restoring Interstate's operations. The stipend for extra wages was calculated by Phoenix's accountant and expert witness, Tammy Novo. *Id.*; Pl.'s Opp'n at 6. Novo's Extra Expense Payroll Summary chart was duly presented to Interstate. *Id.* at 16. Phoenix denied Interstate's claims for hourly workers' regularly scheduled hours and for salaried employees' pay and vacation time. *Id.* at 7.

4

On June 13, 2016, Interstate objected to the "extra expenses" sum offered by Phoenix as compensation for extraordinary employee expenses. Def.'s SOF ¶ 8. On July 8, 2016, Phoenix asked Interstate for more information about its employees' duties during the suspension period. Interstate responded on August 25, 2016. *Id.* After reviewing the additional data, on October 12, 2016, Phoenix offered Interstate an additional $8,000. *Id.* ¶ 9. Two months later, on December 26, 2016, Interstate rejected the offer and demanded a payment of $70,293.20. *Id.* ¶ 10. It also "alleg[ed] that Phoenix engaged in unfair and deceptive acts and practices" in the handling of Interstate's claim. *Id.*

Needless to say, neither side budged any farther, and on April 13, 2017, Interstate began this lawsuit.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original). A material fact is one

which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). In assessing the genuineness of a material dispute, the facts are to be "viewed in the light most flattering to the party opposing the motion." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). Contractual provisions in an insurance policy are construed by the trial judge as "a matter of law." *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp. 2d 260, 262 (D. Mass. 2004).

## DISCUSSION

The parties deploy arguments on each of the three causes of action set out in the Complaint – breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive claim settlement practices. I will address each, although only the first really matters.

### *Breach of Contract*

Interstate contends that by refusing to reimburse the regularly scheduled wages of Interstate's hourly employees accrued during the suspension period, as well as the earnings and added vacation time for the salaried employees, Phoenix breached the "Extra Expenses" provision of the Policy. The employees' duties, Interstate argues, were "outside the scope of their normal jobs," and as such, it is entitled to a full reimbursement. Pl.'s

Opp'n at 9. Phoenix counters that because these costs would have been incurred "if there had been no direct physical loss of or damage to property," Interstate is out of luck. Def.'s Mem. at 7. Under general principles of contract law, "the terms of an insurance policy will be construed 'according to the fair meaning of the language used, as applied to the subject matter.'" *Mass. Insurers Insolvency Fund v. Premier Ins. Co.*, 449 Mass. 422, 426 (2007) (quoting *Davis v. Allstate Ins. Co.*, 434 Mass. 174, 179 (2001)). Abiding by this guidance, the court will attempt to discern "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen Paper Co. v. U.S. Fidelity and Guar. Co.*, 407 Mass. 689, 700 (1990).

Interstate's reading of the Policy runs flatly contrary to its plain meaning. The Extra Expenses provision clearly describes "extra expenses" as the "reasonable and necessary expenses . . . that you incur during the 'period of restoration' and that you would not have incurred if there had been no direct physical loss of or damage to property." Def.'s Mem. at 7. An "objective, reasonable insured" – in this case, Interstate – would know that had the business interruption not occurred, it would have been liable in the ordinary course for the expenses and wages of its hourly workers and salaried employees. *Hazen Paper*, 407 Mass. at 700. Nothing in the Policy suggests

an exception from its words of exclusion implying coverage for employees whose normal schedules are disrupted or inconvenienced because of the occurrence. The only exception is for those hourly workers who expend time over and above what they are scheduled to perform in the tasks of minimizing and repairing damage and restoring regular operations.[3]

By its own admission, Interstate notes that many of its employees were unable to work at all during the suspension period and went largely unpaid. Far from incurring extra expenses, Interstate saved money on employee compensation by not paying those hourly employees for whom there was no work to do. Consequently, as a matter of law, Interstate's hourly and salaried employees' regular wages do not constitute "extra expenses" according to the Policy's "fair meaning," *Davis*, 434 Mass. at 179, and on this point there is no genuine dispute.

---

[3] While the parties and the court are unable to locate any Massachusetts case directly on point, Phoenix cites several supportive cases from other jurisdictions. *See Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, 2009 U.S. Dist. LEXIS 64010, at *22 (E.D. La. 2009) (denying insurance payment for wages of salaried employees who assumed different duties in the aftermath of Hurricane Katrina because plaintiffs "offered nothing to demonstrate that their payroll costs are 'extra'"); *Fold-Pak Corp. v. Liberty Mut. Fire Ins. Co.*, 784 F. Supp. 49, 55 (W.D.N.Y. 1992) ("Expenses such as . . . salaries . . . are expenses that [the insured] would have incurred even had there been no [incident].").

There is, however, a material dispute as to whether Interstate can recover for the compensatory vacation time it offered to its salaried employees who worked beyond their normally scheduled hours during the suspension period. The Massachusetts Wage Act provides, in relevant part: "Every person having employees in his service shall pay . . . wages earned to him . . . . [These wages] may be paid weekly, bi-weekly, or semi-monthly to a salaried employee . . . . The word 'wages' shall include any holiday or vacation payments due an employee under an oral or written agreement." Mass. Gen. Laws ch. 149, § 148. Extra vacation time is considered part of an employee's "wages" under Massachusetts law, and is treated similarly to overtime pay for hourly employees as an additional payroll expense falling outside employees' regular wages or salaries. Because Interstate would not have made extra vacation time available to its salaried employees had the accident not happened, and because it was offered "to avoid or minimize the suspension of business," the additional vacation time incurred by Interstate as a matter of law is a compensable "extra expense" under the Policy. Def.'s Mem. at 7.

Phoenix argues that by never seeking payment for the added costs of compensatory vacation time, Interstate waived any coverage for the expense to which it was entitled under the Policy. *See* Def.'s Opp'n to Pl.'s Cross-

Motion for Summary Judgment, Dkt. #32, at 5 ("Interstate cannot now baldly assert that it is entitled to coverage for alleged expenses that were neither claimed nor proven with any competent evidence."). While Phoenix's irritation about the lack of clear notice is reasonably well taken, there is evidence in the record, albeit slight, that suggests otherwise. In a "preliminary worksheet" sent to Novo for employment compensation, Interstate included two separate line items for its salaried employees' pay, listed as "Sal" and "Sal+vac." Skogstrum Aff., Dkt. #28-1, Exs. 4 and 6. In every instance, the "Sal+vac" amount was larger (if often marginally so) than the "Sal" amount, raising a fair inference that Interstate was attempting to claim the monetary value of the extra vacation time it extended to its salaried employees.

Here, as a matter of law, Phoenix breached its duty to its insured to explore the issue further and make a fair offer of settlement.[4] Inherent in an insurance contract is the insurer's duty of good faith in its dealings with the insured. *Sarnafil, Inc. v. Peerless Ins. Co.*, 34 Mass. App. Ct. 248, 255-256 (1993), *aff'd*, 418 Mass. 295, 303-304 (1994) (an unjustified disclaimer of

---

[4] Given Interstate's feeble attempt to raise the issue with Phoenix in making its claim, I find nothing that suggests bad faith on Phoenix's part in failing to divine the insured's intent. All I find is a negligent, if forgivable, failure on the part of Phoenix to step into the breach.

coverage or refusal to defend prevents an insurer from holding the insured to the strict terms of the contract and may permit recovery not only of defense costs but also the excess costs of any reasonable settlement). "Even excessive demands on the part of a claimant . . . do not relieve an insurer of its statutory duty to extend a prompt and equitable offer of settlement once liability and damages are reasonably clear." *Bobick v. United States Fid. & Guar. Co.*, 439 Mass. 652, 661-662 (2003). It now falls to Phoenix to make good on this aspect of the claim.

*Breach of Implied Covenant of Good Faith and Fair Dealing*

Interstate argues that Phoenix breached the covenant of good faith and fair dealing implicit in the Policy contract because it "knowingly fail[ed] to pay for the employees' wages for services they provided to attend to and handle the Loss." Compl. ¶ 33. Massachusetts law implies a covenant of good faith and fair dealing in every contract; both parties implicitly agree to do nothing "that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 381 (2004) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)). The covenant, however, cannot "be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." *Uno*, 441 Mass. at 385.

11

Interstate provides no proof of bad faith, other than to state that because Phoenix did not include the regular wages of Interstate's employees or the additional vacation time on its Payroll Summary, its analysis of Interstate's claim was "incomplete and inaccurate." Pl.'s Opp'n at 16. This is simply not true insofar as the wage claim is concerned, as earlier explained, and Interstate cannot now invoke the covenant to create extended coverage (business interruption insurance) that it could have purchased, but for whatever reason did not.

*Unfair and Deceptive Acts and Claim Settlement Practices*

Massachusetts law forbids entities involved in trade or commerce from utilizing "unfair methods of competition and unfair or deceptive acts or practices." Mass. Gen. Laws ch. 93A, § 2. An insurer can engage in unfair claim settlement practices by:

> (f) Failing to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; [and/or]
>
> (g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.[5]

To make out an actionable Chapter 93A claim, a plaintiff must show that "the challenged misconduct [rises] to the level of an 'extreme or egregious'

---

[5] Mass. Gen. Laws. ch. 176D, §§ 3(9)(f) and (g).

business wrong, 'commercial extortion,' or similar level of 'rascality' that raises 'an eyebrow of someone inured to the rough and tumble of the world of commerce.'" *Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (quoting *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014)). That two parties engaged in a "good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a [Chapter] 93A claim is made." *Duclersaint v. Fed. Nat. Mortg. Ass'n*, 427 Mass. 809, 814 (1998). So it is here.

## ORDER

For the foregoing reasons, Phoenix's motion for summary judgment, with the exception of Interstate's vacation time breach of contract claim, is <u>ALLOWED</u>. Phoenix will promptly make a fair offer of settlement of the vacation-time issue and report to the court within thirty (30) days of the date of this Order. If necessary, the court will provide the services of a court mediator. Interstate's cross-motion for summary judgment is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns_____
United States District Judge